J-A06005-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: E.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.T., FATHER | No. 2393 EDA 2014 |

Appeal from the Order entered August 7, 2014
In the Court of Common Pleas of Montgomery County
Orphans' Court, at No(s): 2013-A0184

BEFORE:  PANELLA, OTT, and JENKINS, JJ.

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 20, 2015**

D.T. ("Father") appeals from the order entered on August 7, 2014, in the Court of Common Pleas of Montgomery County, involuntarily terminating his parental rights to his male child, E.K., born in September 2009, ("Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b), and changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  We affirm.

We summarize the relevant factual and procedural history as follows. From the time of Child's birth, he was moved to and from numerous residences and placed in the care of numerous caregivers.  At the time of Child's birth, Father was incarcerated as a result of an incident of domestic violence toward Mother.  Prior to Child's birth, Mother had made a private arrangement to give Child up for adoption to A.K.  A.K. had accompanied

---

[1] The trial court involuntarily terminated the parental rights of E.K.'s mother, T.B. ("Mother").  Mother did not file a notice of appeal.

Mother to the delivery room and, upon his discharge from the hospital, took Child to her home, despite having no formal adoption arrangement or biological relationship with Child. A.K. had Mother's consent to adopt Child, but did not have Father's consent. She consulted an adoption attorney who contacted Father concerning the possible adoption. Father declined to consent to an adoption. A.K. continued to care for Child from the time of his birth in September 2009 until the end of December 2009.

Father was released from prison in October of 2009, and Mother was incarcerated later that month. Following his release from prison, Father attempted to become involved with Child and lived with Child and A.K. in A.K.'s home. At the end of December 2009, A.K. asked Father to leave her home, and he left, taking Child with him. A.K. visited Child in January, and took Child back to her home for a period of two or three weeks. However, A.K. returned Child to Father at the end of January of 2010.

Father moved multiple times from January 2010 until June 2010, taking Child with him, and, at other times, leaving Child with an aunt, with another aunt, with Mother, or with another woman.

On June 7, 2010, Father reported that he found a permanent residence in Pottstown, Pennsylvania. On November 24, 2010, The Office of Children and Youth of Montgomery County ("OCY") learned of several domestic violence incidents at the home where Father was living with Child and a woman. On October 14, 2010, Father was arrested and incarcerated, and,

at that time, Child was taken into custody by OCY. At that time, OCY worked toward reuniting Child with Mother, and eventually returned Child to Mother in 2011. A second dependency petition was filed later in 2011. In November 2011, Father and Mother, who had custody of Child, were evicted from a Pottstown apartment, and were living in a Salvation Army homeless shelter. On November 30, both Father and Mother tested positive for drugs. Child was placed with a Montgomery County foster family.

During the time that Child was in foster care, the family who had adopted his sister, O.T., sought to become Child's foster parents as well, and to create a relationship between Child and his sister. However, OCY continued to have a goal of reunification with Child's parents. In 2012, OCY moved Child from his foster home and placed him in another foster home with his current foster parents, M.T. and J.T., and with his sister. In September 2013, Child's guardian *ad litem* filed a Petition to Terminate Parental Rights. Child has been in the current care of M.T. and J.T. for 32 months.

Termination hearings were held on May 28, 2014, June 25, 2014, July 2, 2014, and August 6, 2014. By order entered on August 7, 2014, the trial court terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b), and changed Child's permanency goal to adoption pursuant to section 6351 of the Juvenile Act. This timely appeal followed.

In reviewing an appeal from the termination of parental rights, we review the appeal in accordance with the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id*.; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **See In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

**Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Father's parental rights under section 2511(a)(2), (5), (8), and (b). We will focus on section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

After a careful review of the record, we find that the trial court aptly discussed the evidence against the requirements of section 2511(a)(2) and (b). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include

acts of refusal as well as incapacity to perform parental duties. ***See In re A.L.D.*** 797 A.2d 326, 337 (Pa. Super. 2002).

In his brief, Father claims that he has overcome his addiction problems, that he has not been incarcerated again, and that he has completed the goals set out in the FSP created by OCY, so he is ready to be reunited with Child and capable of parenting. The trial court disagreed. It found that the guardian *ad litem* had established a basis for termination of Father's parental rights by clear and convincing evidence.

The trial court properly determined that the principal area of concern is Father's lack of understanding of Child's need for housing, caregiver stability, and Father's inability to place Child's needs first. The trial court also expressed concern over Father's aggressive behavior, including recent incidents of verbal aggression toward Mother and Child's foster parents. A third area of concern was the drug and alcohol use by Father; Father's testimony with regard to recent drug use and testing; and Father's inconsistent attendance at medical appointments for dialysis essential for Father's own health.

In 2013, OCY was working toward the reunification of Child and Father by increasing the visits that Child had with Father, eventually introducing overnight visits once each week at Father's home. Following several months of overnight visits with Child, in February 2014, Father moved to a new, larger apartment in Pottstown with a woman identified as B.C, his fiancée,

and her son, D. OCY caseworker, Amber Jasinski, testified that she discouraged Father from making such a move at that juncture since this took away from attention that Father showed to Child. *See* N.T., 8/6/14, at 142-143.

At the termination hearing on May 28, 2014, the guardian *ad litem* presented the testimony of William Russell, Ph.D., a psychologist who conducted a bonding evaluation and a parenting capacity evaluation with respect to Child, Mother, Father, and Foster Parents. Dr. Russell noted that the main concern in his evaluation is the ability of Father to provide for safety and permanency in terms of the child or children.

Father asserted that he had completed all of the FSP goals set up for him. At the time that the Petition to Terminate Father's Parental Rights was filed, OCY also appears to have concluded that Father had overcome his obstacles and challenges and had complied with all of the requirements of his FSP, and that reunification with Father was appropriate. However, the guardian *ad litem* introduced evidence of continued aggression by Father toward Mother and Child's foster parents, as well as continued drug and alcohol use, and OCY agreed.

Dr. Russell opined that the transition to a new home with new family members was an added challenge for Child, at a moment when it should be a priority for Father to focus on Child's needs and create a sense of stability and consistency for Child. Dr. Russell also noted concerns regarding

Father's past drug use and criminal activity, past history of domestic violence, and significant history of moving frequently and housing instability. In addition, Dr. Russell testified that Father receives an income of approximately $700.00 per month from SSI. Dr. Russell stated that the rent for the new apartment in Pottstown is $850.00 per month, an amount that Father cannot afford without the help of B.C., and Father would not be able to afford if the relationship were to end.

Ms. Jasinski, the OCY caseworker, testified at the hearing that Father has been verbally aggressive with her and made her uncomfortable. Father acknowledged that he had expressed frustration with the caseworker. *See* N.T. 8/6/14, at 203. Although Father testified that he would attempt to work with the Foster Parents, he also admitted that he hated them with a passion. *See id*. He also sent repeated, harassing, and even threatening text messages to Mother. Thus, despite OCY's requirement that Father complete an anger management class, the trial court found that Father was still acting in an aggressive and threatening manner toward Mother and the Foster Parents.

Equally troubling is the fact that, despite Father's assertion that he had completed outpatient drug counseling and submitted to random urine screens, Father had three positive drug and alcohol tests with OCY in the last fourteen months before the hearing, testing positive for cannabinoids on July 18, 2013, for opiates on January 4, 2014, and for alcohol on July 18,

2014. Similarly, Father acknowledged to a physician in connection with his dialysis treatment that he had been out drinking the night of January 31, 2014, before his dialysis treatment on February 1, 2014. *See* N.T., 8/6/14, at 282.

Moreover, Father was inconsistent in attending his necessary dialysis treatments to protect his own health. Evidence showed that, on 19 occasions over 38 weeks, Father was either late, left early, or missed his appointment entirely, due to either transportation issues, oversleeping, or not feeling well. *See id*. at 275-284.

The trial court prudently concluded that the conditions which led to Child's removal included housing instability, incarceration of each of the parents, drug and alcohol use, and domestic violence, have not been resolved. The court found that, while Father has been able to make some progress in completing some of his FSP goals and has avoided further incarceration, the guardian *ad litem* established, by clear and convincing evidence, that Father continues to have issues regarding drug and alcohol use, housing, and anger management, and that these issues cannot or will not be remedied by Father within a reasonable period of time. Moreover, the trial court found that Father lacks the capacity to parent Child. This Court finds competent evidence to support the trial court's determination that Father lacks the capacity to parent Child under section 2511(a)(2).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

With regard to section 2511(b), the evidence reveals that Father does have an interest in and affection for Child, which suggest the presence of a psychological attachment. However, Dr. Russell noted that concerns arise regarding the potential impact that Father's troubled history will have on his ability to provide structure and consistency to Child on a permanent basis. Dr. Russell recommended that reunification of Child with Father be deferred for a period of at least 12 months.

Child has a strong emotional bond with his foster parents. He has been living with them for the last thirty-two months. They take care of all of his needs. The trial court correctly found that there is no evidence that Child would be adversely affected if his relationship with Father is severed.

The competent evidence in the record shows Father failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). He did not put himself in a position to assume daily parenting responsibilities so that he could develop a real bond with Child. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

Although Father may love Child and desire an opportunity to serve as his father, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

We next consider whether the trial court abused its discretion by changing Child's permanency goal to adoption. Our standard of review is as follows.

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that

the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008). *See also In re R.J.T.*, A.3d 1179, 1190 (Pa. 2010).

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671 *et seq*. *See In re M.S.*, 980 A.2d 612, 615 (Pa. Super. 2009). We have recognized that "[b]oth statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. . . . ASFA promotes the reunification of foster care children with their natural parents when feasible. . . . Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved 'whenever possible.'" *Id*. (citing 42 Pa.C.S.A. § 6301(b)(1)). Accordingly, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *See In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." *Id*. (citation omitted).

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the following factors:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

   (1) The continuing necessity for and appropriateness of the placement.

   (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

   (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

   (4) The appropriateness and feasibility of the current placement goal for the child.

   (5) The likely date by which the placement goal for the child might be achieved.

   (5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

   (6)  Whether the child is safe.

                           . . . .

   (9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child . . . .

42 Pa.C.S.A. § 6351(f)(1)-(6), (9).  "These statutory mandates clearly place the trial court's focus on the best interests of the child."  **In re S.B.**, 943 A.2d at 978 (citation omitted).  We have stated, "[s]afety, permanency, and

- 14 -

well-being of the child must take precedence over **all** other considerations." *Id*. (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

In this case, during Father's hearing, evidence was presented that it would be in the best interest of Child to change his goal from reunification to adoption. Given Father's repeated failure to make progress in achieving his family service plan objectives, and considering that it is unlikely that Father will ever complete these objectives, we conclude that the trial court did not abuse its discretion by changing Child's permanency goal to adoption.

Accordingly, we affirm the Order involuntarily terminating Father's parental rights pursuant to sections 2511(a)(2) and (b), and changing Child's permanency goal from reunification to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2015

- 15 -